PLANNED PARENTHOOD OF CENTRAL NEW JERSEY, Herbert Holmes, M.D., David Wallace, M.D., and

Gerson Weiss, M.D., on behalf of themselves and their patients, Plaintiffs,

v.

Peter G. VERNIERO, Attorney General of the State of New Jersey, in his official capacity, and his successors in office, New Jersey Board of Medical Examiners, and their successors in office, and Len Fishman, Commissioner of the Department of Health and Senior Services, in his official capacity, and his successors in office, Defendants,

and

New Jersey Legislature, by and through Donald T. Difrancesco, in his official capacity as President of the New Jersey Senate, and as the representative of the New Jersey Senate, and Jack Collins, in his official capacity as Speaker of the New Jersey Assembly, and as the representative of the New Jersey Assembly, Defendant-Intervenor.

Civil No. 97–6170(AET).

United States District Court, D. New Jersey.

Dec. 8, 1998.

Lenora M. Lapidus, ACLU of New Jersey Newark, NJ, Talcott Camp, Reproductive Freedom Project ACLU Foundation, New York, NY, Dara Klassel, Planned Parenthood Federation of America, New York, NY, for Plaintiffs.

Richard F. Collier, Jr., David J. Treibman, on the briefs, Somerset, NJ, for Intervenor–Defendant New Jersey State Legislature.

## OPINION

ANNE E. THOMPSON, Chief Judge.

### I. Introduction

Plaintiffs, Planned Parenthood of Central New Jersey and several physicians, bring this action against defendants, the Attorney General of the State of New Jersey, the New Jersey Board of Medical Examiners and the Commissioner of the Department of Health and Senior Services, pursuant to 42 U.S.C. §§ 1983 and 1988 and pursuant to 28 U.S.C. §§ 2201 and 2202. Plaintiffs seek declaratory and injunctive relief from this Court to prevent the New Jersey Partial–Birth Abortion Ban Act of 1997, ch. 262, 1997 N.J. Sess. Law Serv. 871–72 (West), *codified at* N.J. Stat. Ann. §§ 2A:65A–5 to –7 (the "Act"), from taking effect. This Act exposes those who perform "partial-birth abortions" to professional license revocation and fines. Plaintiffs challenge the constitutionality of the Act on the grounds that it is vague and that it imposes an undue burden on a woman's right to choose to have an abortion.

The matter is before the Court on plaintiffs' request for a declaration that the Act is unconstitutional and for a preliminary and permanent injunction. Plaintiffs contend that an injunction is necessary to prevent irreparable harm to themselves and their patients from the statute's chill-ing effect on their ability to provide abortion services. The Court has reviewed the parties' briefs, proposed findings of fact and conclusions of law, affidavits of the experts, testimony of the witnesses, and relevant caselaw. For the reasons set forth below, the Court grants to plaintiffs the relief they seek.

### II. Findings of Fact

#### A. The Challenged Statute

The Act prohibits the performance of a "partial-birth abortion." *See* N.J. Stat. Ann § 2A:65A–6(a). The Act defines the banned conduct as "an abortion in which the person performing the abortion partially vaginally delivers a living human fetus before killing the fetus and completing the delivery," N.J. Stat. Ann. § 2A:65A–6(e), and further defines the phrase "vaginally delivers a living human fetus before killing the fetus" to mean "deliberately and intentionally delivering into the vagina a living fetus, or a substantial portion thereof, for the purpose of performing a procedure the physician or other health care professional knows will kill the fetus, and the subsequent killing of the human fetus," N.J. Stat. Ann. § 2A:65A–6(f). The ban applies throughout pregnancy.

The Act does not define "partially" as it modifies "vaginally delivers," "deliver," "substantial," "substantial portion," or "procedure." The Act does not require that the fetus be intact or viable at the time the "partial-birth abortion" is performed. The Act allows an otherwise banned procedure only when such a procedure "is necessary to save the life of the mother whose life is endangered by a physical disorder, illness or injury." N.J. Stat. Ann. § 2A:65A–6(b). The Act contains no exception for procedures necessary to preserve the woman's health.

Under the Act, "knowing" performance of a "partial-birth abortion" subjects a physician to immediate license revocation and a $25,000 fine for each incident. *See* N.J. Stat. Ann. § 2A:65A–6(c). An ambu-

latory health care facility in which a "partial-birth abortion" occurs is also subject to immediate revocation of its license under the Act. *See* N.J. STAT. ANN. § 2A:65A–6(d); *see also* SENATE WOMEN'S ISSUES, CHILDREN AND FAMILY SERVICES COMMITTEE, STATEMENT TO THE GEN. ASSEMBLY, No. 2409–L.1997, c. 262 ("[T]he bill provides that a woman upon whom a partial-birth abortion is performed shall be immune from civil or criminal liability for a violation of the provisions of the bill.").

## B. Parties

### 1. Plaintiffs

Plaintiff Gerson Weiss, M.D., is licensed to practice medicine in the State of New Jersey. He is a professor in and Chairman and Chief of Service of the Department of Obstetrics and Gynecology at the University of Medicine and Dentistry of New Jersey–New Jersey Medical School ("UMDNJ"), located in Newark, New Jersey. He is also Director of the Center for Reproductive Medicine, which is affiliated with Hackensack Hospital. Dr. Weiss is board-certified in obstetrics and gynecology, and has a subspecialty board-certification in reproductive endocrinology. In his position as Chairman and Chief of Service at UMDNJ, Dr. Weiss oversees the provision of all obstetrical and gynecological care at the hospital, including abortions up through eighteen weeks measured from the first day of the woman's last menstrual period ("lmp"). He established the training program and teaches residents to provide the full range of obstetric and gynecological care, including abortions. Dr. Weiss has performed abortions since 1968, and has personally performed between 500 and 1000 abortions. He has used the suction curettage, or vacuum aspiration, dilation and evacuation, or D & E, and installation methods. He has also performed hysterotomy abortions. Dr. Weiss was qualified to testify as an expert in obstetrics and gynecology, including abortion methods. He sues on his own behalf and on behalf of his patients.

Plaintiff David Wallace, M.D., is licensed to practice medicine in the State of New Jersey. He is President of the Medical Staff at Monmouth Medical Center, which is affiliated with the St. Barnabas Health Care System in Long Branch, New Jersey. He is Chairman of the Department of Obstetrics and Gynecology and Director of the Residency Program. Dr. Wallace is board-certified in obstetrics and gynecology, and is eligible for certification in maternal-fetal medicine. Since 1980, Dr. Wallace has performed between 1500 and 2000 abortions. He currently performs about fifty abortions annually. Dr. Wallace provides, supervises, and teaches abortions through twenty-three weeks lmp. For procedures in the first trimester, he uses the vacuum aspiration method. For early second trimester procedures, through sixteen weeks lmp, he uses the D & E method. In his supervisory capacity, he teaches and supervises the performance of these abortion techniques. Dr. Wallace was qualified to testify as an expert in obstetrics and gynecology, including abortion methods. He sues on his own behalf and on behalf of his patients.

Plaintiff Herbert Holmes, M.D., is licensed to practice medicine in the State of New Jersey. He is a clinical associate professor of obstetrics and gynecology at UMDNJ, where he is the primary physician who performs abortions. He is also an attending surgeon at Newark Beth Israel Hospital with primary responsibility for abortions. Annually, Dr. Holmes performs four to five hundred first trimester suction curettage abortions and two to three hundred second trimester D & E abortions up through eighteen weeks lmp. He performs D & E abortions after eighteen weeks lmp where there is a demonstrable fetal abnormality. Until recently, while he was affiliated with United Hospitals in Newark, New Jersey, Dr. Holmes performed induction and installation abortions through twenty weeks lmp generally, and through twenty-four weeks lmp in the case of fetal abnormality or risk to the

mother's health. Dr. Holmes was qualified to testify as an expert in obstetrics and gynecology, including abortion practice. He sues on his own behalf and on behalf of his patients.

Plaintiff Planned Parenthood of Central New Jersey ("Planned Parenthood") is an ambulatory health care facility licensed pursuant to N.J.A.C. § 8:43A–1.3, which provides vacuum aspiration abortions up to fourteen weeks lmp. It sues on its own behalf and on behalf of its patients.

Among plaintiffs' patients are women seeking abortions for a wide range of reasons, including the protection of health and life. They include women who develop serious health problems because of their pregnancies, and women for whom pregnancy presents particularly significant risks because of preexisting health conditions such as neurological disease, kidney disease, severe high blood pressure, cardiac conditions, cancer, diabetes, and other physical and mental health disorders. Among plaintiffs' patients seeking abortions are women for whom a pregnancy endangers health, but not necessarily life. One such example is the risk of blindness that pregnancy poses for certain diabetic women.

### 2. Defendants

Defendant Peter G. Verniero is Attorney General of the State of New Jersey and is responsible for enforcement of the Act. *See* N.J. Stat. Ann. § 2A:65A–6(c), (d). He is sued in his official capacity. The Office of the Attorney General declined to defend the Act.

Defendant New Jersey Board of Medical Examiners is responsible under the Act for license revocation in cases where physicians are found to have violated the Act. *See* N.J. Stat. Ann. § 2A:65A–6(c). The Office of the Attorney General, charged with representing all state entities including the Board of Medical Examiners, declined to defend the Act.

Defendant Len Fishman is Commissioner of the Department of Health and Senior Services ("HSS") of New Jersey and is responsible under the Act for license revocation in cases where ambulatory health care facilities are found to have violated the Act. *See* N.J. Stat. Ann. § 2A:65A–6(d). He is sued in his official capacity. As stated above, the Office of the Attorney General, charged with representing HHS, declined to defend the Act.

The New Jersey State Legislature was granted permission by this Court to intervene to defend the Act. *See Planned Parenthood of Central N.J. v. Verniero,* No. 97–6170, slip op. at 1 (D.N.J. Dec. 24, 1997) (Order).

### C. Witnesses

#### 1. Plaintiffs' Witnesses

In addition to testimony by Drs. Weiss, Wallace and Holmes, plaintiff also offered into evidence the curriculum vitae and declaration of Carolyn Westhoff, M.D. Dr. Westhoff is an Associate Professor of Clinical Obstetrics and Gynecology and of Public Health at the College of Physicians and Surgeons of Columbia University in New York City, New York. She is also Medical Director of Family Planning and an associate attending physician at Columbia Presbyterian Medical Center in New York City. She is board-certified in obstetrics and gynecology. Dr. Westhoff presently performs only first trimester abortions, but has in her career performed more than five hundred second trimester abortions, including D & E, induction, saline installation and hysterotomy abortions. She teaches courses dealing with epidemiology, sexuality and reproduction, and reproductive health, including abortion techniques.

#### 2. Defendants' Witnesses

Frank Henry Boehm, M.D., is Professor of Obstetrics and Gynecology at Vanderbilt University and Director of Obstetrics at Vanderbilt Medical Center. He is board-certified in obstetrics and gynecology and as a maternal fetal medicine specialist. Dr. Boehm has in his career performed first trimester D & C abortions and second

trimester D & E, induction and hysterotomy abortions, and he teaches these abortion methods. In the past ten years, he has performed only two D & E abortions on live fetuses. Dr. Boehm was qualified to testify as an expert in obstetrics and gynecology, including abortion methods.

Watson A. Bowes, Jr., M.D., is Clinical Professor of Obstetrics and Gynecology at the University of North Carolina. He is board-certified in obstetrics and gynecology and as a maternal fetal medicine specialist. Between 1965 and 1967, while a resident at the University of Colorado, Dr. Bowes performed less than one hundred induction abortions. Since 1967, he has performed four or five abortions on live fetuses in cases where the life of the mother was at risk, including two D & E and one or two induction abortions, all before eighteen weeks lmp. With this above exception, Dr. Bowes has observed no abortions on live fetuses since 1967. He does perform between twenty and forty dilation and curettage, or D & C, procedures, a variation of the D & E method, annually where there has been an incomplete spontaneous abortion. He has also performed D & E and induction abortions in cases of fetal death. He teaches D & C, D & E, and induction abortion procedures. Dr. Bowes was qualified to testify as an expert in obstetrics and gynecology, including abortions.

### D. Abortion Practice

An understanding of abortion in general and the various abortion methods in particular is necessary to any evaluation of the Act's constitutionality. The Court's understanding of these issues was derived from expert witness testimony, exhibits and affidavits. *See* FED.R.EVID. 702 ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a

fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."); *Virgin Islands v. Sanes,* 57 F.3d 338, 341 (3d Cir.1995) (noting the district court's broad discretion to admit or rely on expert testimony).

### 1. Abortion Practice Generally

The abortion procedure is considered to be generally safe. The risk of death from abortion does, however, increase as the pregnancy progresses.[1]

The following five conventional methods of abortion have been described to the Court: (1) suction curettage; (2) dilation and evacuation, or D & E; (3) induction, including installation; (4) hysterotomy; and (5) hysterectomy. In choosing which abortion procedure is most appropriate and in performing such procedure, the physician takes into account a number of factors, including the health and medical history of the patient, the gestational age, condition and position of the fetus, the skill of the physician, and the facilities available. Performance of a particular procedure will vary from physician to physician and, in procedures performed by one physician, from patient to patient. During each procedure, however, the intent of the physician is to terminate the pregnancy as efficiently as possible and in the way that is safest for the woman.

### 2. Specific Abortion Procedures

#### a. Suction Curettage

Approximately ninety percent (90%) of all abortions are performed prior to twelve weeks lmp. Suction curettage, also known as vacuum aspiration, is considered the standard of care during the first trimester, takes less than five minutes to complete, and is performed in an out-patient setting. During the procedure, the physician first cleanses the vagina and then grasps the

---

1. Dr. Westhoff explains in her declaration that the risk of death from abortion increases about thirty percent (30%) with each week of gestation from eight weeks lmp to twenty

weeks lmp. Dr. Westhoff adds that the risk of major medical complications increases about twenty percent (20%) with each week of gestation from seven weeks lmp to full term.

cervix with a clamp. She then inserts into the cervix mechanical dilators-smooth metal or plastic dowels-of increasing diameter to gradually dilate the cervix. Once the cervix is sufficiently dilated, the physician inserts a cannula-a hollow tube with a blunt tip and openings on its side-into the uterus. The cannula is attached to a suction or vacuuming device. Suction is used to remove the uterine contents, including the amniotic fluid, the fetus and the placenta. Once this is done, the physician may scrape the uterine walls with a curette-a loop of metal with a sharp to dull edge-to insure that the uterus is empty.

During the suction curettage procedure, the cannula runs through the vagina and cervix into the uterus. The fetus may come through the cannula either intact or disarticulated. At times, part of the intact fetus may be in the vagina and part in the uterus, or a disarticulated part of the fetus may be in the vagina while the remainder of the fetus is in the uterus. In either of these situations, that part of the fetus which remains in the uterus may still have a heartbeat.

   b.   Dilation and Evacuation (D & E)

Dilation and evacuation, or D & E, procedures make up eighty to ninety percent (80–90%) of abortions performed after the first trimester and are performed from thirteen to twenty weeks lmp. During this procedure, the physician dilates the cervix in one of two ways. The physician may use mechanical dilators, as described above, or osmotic dilators. Osmotic dilators-thin straws containing laminaria or some other substance which swells when it comes in contact with water-are inserted into the cervical canal twelve to thirty hours prior to the procedure. The dilators swell and either partially or completely dilate the cervix. When the cervix is sufficiently dilated, the physician removes the dilators, grasps the cervix, and cleans the vagina. After using light suction to rupture the amniotic sac, the physician begins a largely blind procedure, inserting forceps into the uterus, grasping a conception product and pulling it out. This action is repeated until the fetus has been removed. Lastly, the physician uses suction to remove the placenta.

During the D & E procedure, the fetus may be removed from the uterus and brought through the cervix and vagina either intact or disarticulated. Whether disarticulation occurs will depend largely on the amount of dilation, i.e., whether the cervix is sufficiently dilated to permit the fetus to pass through the internal os, and the gestation of the fetus, i.e., the fetus is more frail and prone to disarticulation during earlier stages of pregnancy. With this in mind, it may happen that part of the intact fetus will be in the vagina and part in the uterus or a disarticulated part of the fetus will be in the vagina while the remainder of the fetus is in the uterus. In either of these situations, that part of the fetus which remains in the uterus may still have a heartbeat.

From approximately fourteen weeks lmp until term, the physician may grasp the fetus by the feet or legs and draw the fetus intact through the cervix into the vagina where the fetal head may get stuck in the internal cervical os. At this point, the fetus may still have a heartbeat. The physician will apply suction to dislodge the head. However, if this does not work, the physician must either disarticulate the fetal head and deliver it apart from the body or collapse the fetal head in order that the fetus may be delivered intact. This latter option resembles a procedure the American College of Obstetricians and Gynecologists ("ACOG") calls an "intact dilatation and extraction." See ACOG EXECUTIVE BOARD, STATEMENT ON INTACT DILATATION AND EXTRACTION 1 (January 12, 1997) ("ACOG Statement").

The intact dilatation and extraction, or intact D & X, has not been the subject of clinical trials or peer-reviewed studies and, as a result, there are no valid statistics on its relative safety. As its "elements are part of established obstetric techniques," id., the procedure may be presumed to

pose similar risks of cervical laceration and uterine perforation. However, because the procedure requires less instrumentation, it may pose a lesser risk. Moreover, the intact D & X may be particularly helpful where an intact fetus is desirable for diagnostic purposes.

### c. Induction and Installation

During the second trimester, but generally not before sixteen weeks lmp, the majority of abortions performed that are not D & E abortions are induction abortions. During this procedure, the physician places osmotic dilators in the cervix twelve to twenty-four hours before administering medications intravenously, intramuscularly or by suppository to induce labor. Substances used to induce labor include prostaglandin E2 and F2 alpha. Installation abortions, a subset of inductions, involve injecting a substance into the uterus through the abdomen using a needle or into the cervix using a needle or a cannula to cause uterine contractions. Substances used during installation abortions include concentrated urea or sodium chloride solutions. Labor lasts anywhere from ten to thirty hours, generally resulting in the delivery of an intact fetus. In twenty-five percent (25%) of cases, a curette is then needed to remove the placenta.

During an induction abortion, fetal demise may occur prior to delivery. Sodium chloride, when injected into the uterus or through the cervix, will immediately kill the fetus. Urea solutions, prostaglandins or uterine contractions may cause fetal death before delivery. If the fetus becomes entangled in the umbilical cord, the physician may need to cut the cord in order to effect the delivery. As in the D & E, the fetal head may become lodged in the internal cervical os, requiring the physician to disarticulate the fetal head and deliver it separate from the fetal body or deflate the fetal head in order to effect delivery of the fetus intact. Some complication, such as maternal hemorrhaging, may also necessitate an expeditious delivery, possibly resulting in disarticulation. In any of these situations, fetal death may occur while the fetus is partially in the uterus and partially in the vagina.

Induction abortions are considered to be generally safe, entail a low risk of uterine perforation and, as they normally result in delivery of an intact fetus, are beneficial for fetal anomaly diagnosis. However, the induction procedure is medically inappropriate in those situations where labor would be contraindicated, such as where the woman has a severe cardiac condition, suffers from hypertension or asthma, or has had a previous cesarian section. Moreover, induction abortions require the woman to experience the same physiological and emotional stress as labor and delivery at term, must be performed in a hospital setting, and are less available and more expensive than other out-patient abortion procedures.

### d. Hysterotomy and Hysterectomy

Hysterotomy and hysterectomy are used rarely to terminate pregnancies. A hysterotomy is a pre-term cesarean section, where the abdomen is incised, the uterus is incised and the fetus is delivered out of the uterus through the abdomen. The risk of maternal death attending hysterotomies is three to four times that involved in vaginal delivery and any future deliveries must be performed by cesarian section due to the abdominal scar. A hysterectomy is the removal of the uterus. Hysterectomies also carry an enhanced risk of morbidity and mortality to the woman due to the incidence of hemorrhage. Furthermore, they eliminate the possibility of future childbirth. For these reasons, hysterectomies are generally not performed unless an independent reason requires removal of the uterus before term, *e.g.*, cervical cancer.

### III. Conclusions of Law

#### A. Legal Standard for Injunctive Relief

Plaintiffs challenge the constitutionality of the Act on the grounds that it is vague

and that it imposes an undue burden on a woman's right to choose to have an abortion. Plaintiffs seek an Order from this Court granting plaintiffs' request for declaratory relief and for a preliminary and permanent injunction.

In deciding whether to issue a preliminary injunction, a district court weighs four factors:

> "(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest."

*Gerardi v. Pelullo,* 16 F.3d 1363, 1373 (3d Cir.1994) (quoting *SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1254 (3d Cir.1985)). In deciding whether to issue a permanent injunction, " 'the court must determine if the plaintiff has actually succeeded on the merits (*i.e.,* met its burden of proof).' " *ACLU of N.J. v. Black Horse Pike Reg. Bd. of Educ.,* 84 F.3d 1471, 1477 n. 3 (3d Cir.1996) (quoting *CIBA–GEIGY Corp. v. Bolar Pharmaceutical Co., Inc.,* 747 F.2d 844, 850 (3d Cir.1984), *cert. denied,* 471 U.S. 1137, 105 S.Ct. 2678, 86 L.Ed.2d 696 (1985)).

### B. Preliminary Issues

Before reaching constitutional analysis of the Act, certain preliminary issues raised by the Legislature must be addressed. The Legislature contends that this Court lacks subject matter jurisdiction because plaintiffs lack standing. Alternatively, the Legislature contends that the cause of action is not ripe for adjudication and that abstention is mandated pursuant to *Railroad Comm'n of Tex. v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Each issue is addressed in turn.

#### 1. Standing

■ The Legislature argues that this Court is bound by New Jersey law to read the Act in such a way as to preserve its constitutionality. The Legislature contends that the Court must narrowly construe the Act to limit its scope, *i.e.,* to limit the Act's proscription to the intact D & X abortion procedure described in the ACOG Statement. If this is done, the Legislature contends, plaintiffs do not have standing because they do not, by their own admission, perform that procedure. For the following reasons, this argument is rejected. *See Planned Parenthood of Wisc. v. Doyle,* 162 F.3d 463, 465 (7th Cir.1998) ("The standing of the physician plaintiffs, and of Planned Parenthood as the owner of abortion clinics in Wisconsin, to maintain this suit is not open to question." (citing *Planned Parenthood of Central Mo. v. Danforth,* 428 U.S. 52, 62, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); *Doe v. Bolton,* 410 U.S. 179, 188–89, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973))).

State statutes must be construed to avoid constitutional difficulty whenever possible. *See Communications Workers of Am. v. Beck,* 487 U.S. 735, 762, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988); *United States v. Navarro,* 145 F.3d 580, 589 (3d Cir.1998); *Hamilton Amusement Ctr. v. Verniero,* 156 N.J. 254, 280, 716 A.2d 1137, 1149 (1998). While this "canon of construction that a court should strive to interpret a statute in a way that will avoid an unconstitutional construction is useful in close cases, . . . it is not a license for the judiciary to rewrite language enacted by the legislature." *Chapman v. United States,* 500 U.S. 453, 464, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) (citation and quotation marks omitted); *see also Reno v. ACLU,* 521 U.S. 844, 884, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (noting that a court "may impose a limiting construction on a statute only if it is 'readily susceptible' to such a construction" (quoting *Virginia v. American Booksellers Ass'n, Inc.,* 484 U.S. 383, 397, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988))). This limitation on the Court's ability to narrowly construe an ambiguous statute is informed by separation of pow-

ers and federalism concerns. *See Salinas v. United States,* 522 U.S. 52, 118 S.Ct. 469, 475, 139 L.Ed.2d 352 (1997). This Court is not in a position to rewrite the Act to cure its constitutional infirmities. To do so would involve the federal court in legislating state law, an activity clearly beyond its judicial role and specifically reserved to the state. *See Little Rock Family Planning Servs., P.A. v. Jegley,* No. 97–581, slip op. at 28 (E.D.Ark. Nov. 13, 1998) ("[R]ewriting a statute to cure its constitutional infirmities would impermissibly involve a federal court in 'positive legislative enactment clearly beyond its judicial role.' "(citation omitted)).

Thus, contrary to the Legislature's contentions, these principles of statutory construction support plaintiffs' standing to raise a vagueness challenge to the Act. As physicians who provide abortions, plaintiff doctors are subject to license revocation and civil liability under the Act. *See* N.J. Stat. Ann. § 2A:65A–6(c). Likewise, as an ambulatory health care facility which provides abortions, plaintiff Planned Parenthood is subject to license revocation under the Act. *See* N.J. Stat. Ann. § 2A:65A–6(d). Thus, there is no question that plaintiffs are the "one[s] against whom these ... statutes directly operate." *Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). Plaintiffs allege that the Act's definition of "partial-birth abortion" is so vague that it could be reasonably interpreted to encompass all conventional abortion methods except hysterectomies and hysterotomies. Plaintiffs further allege that they have performed and wish to continue performing these conventional abortions, but that, if the Act goes into effect, they will be forced to stop. Plaintiffs allege facts sufficient to establish their vulnerability under the Act and, thus, to support their standing on the vagueness issue. *See Summit Med. Assoc., P.C. v. James,* 984 F.Supp. 1404, 1429 (M.D.Ala. 1998) (finding standing where court is unable to determine conclusively that abortions performed by plaintiffs "fall outside of the range of abortions proscribed by the act").

Plaintiffs also have standing to challenge the Act on the basis that it imposes an undue burden on a woman's right to choose to have an abortion. It is well-established "that doctors have standing 'to assert the rights of women patients as against governmental interference with the abortion decision.' " *Evans v. Kelley,* 977 F.Supp. 1283, 1302 (E.D.Mich.1997) (quoting *Singleton v. Wulff,* 428 U.S. 106, 115–16, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976)). Third-party standing in this context is justified by the close fiduciary relationship between doctor and patient and by the patient's right to privacy and mootness concerns. *See Carhart v. Stenberg,* 972 F.Supp. 507, 520–21 (D.Neb.1997); *Women's Med. Prof. Corp. v. Voinovich,* 911 F.Supp. 1051, 1058 (S.D.Ohio 1995), *aff'd,* 130 F.3d 187 (6th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1347, 140 L.Ed.2d 496 (1998). Under the Act, plaintiff doctors face license revocation and civil liability and plaintiff Planned Parenthood faces license revocation. Plaintiffs allege that, if the Act goes into effect, it will have the effect of prohibiting physicians from performing and thus effectively preclude women from obtaining most conventional abortions. Such "governmental interference with the abortion decision" supports plaintiffs' standing on the undue burden issue.

### 2. Ripeness

The Legislature contends that, even if plaintiffs have standing, the cause of action is not ripe for adjudication. "Ripeness concerns whether the legal issue at the time presented in a court is sufficiently concrete for decision." *United States ex rel. Ricketts v. Lightcap,* 567 F.2d 1226, 1232 (3d Cir.1977). The ripeness doctrine is intended "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner,* 387 U.S. 136, 148, 87 S.Ct.

1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds, Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). In determining whether a particular case is ripe for adjudication, a district court must consider "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149; *see also Blanchette v. Connecticut Gen. Ins. Corp.,* 419 U.S. 102, 143 n. 29, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974) (listing as factors for case-by-case ripeness determination, *inter alia,* likelihood that plaintiff will disobey the law, present injury due to threat of prosecution, and likelihood of prosecution).

Plaintiffs' case is ripe for adjudication. As this Court has taken time to develop a comprehensive record and resolution of the case depends almost exclusively on matters of law, the case is fit for judicial determination. *See Abbott Labs.,* 387 U.S. at 149; *Artway v. Attorney General of N.J.,* 81 F.3d 1235, 1249 (3d Cir.1996). The facts also support a finding of significant hardship to plaintiffs if the Act goes into effect. When a plaintiff alleges the intention to engage in conduct which is "arguably affected with a constitutional interest" and legislatively-proscribed and a credible threat of prosecution exists, there is no requirement that the plaintiff first expose herself to liability in order to challenge the statute's constitutionality. *See Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). Plaintiffs are subject to the Act's proscriptions and perform constitutionally-permissible abortions which potentially come within the Act's definition of "partial-birth abortion." Thus, the threat of liability under the Act is more than "imaginary or speculative." *Younger v. Harris,* 401 U.S. 37, 42, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *see also Women's Med. Prof. Corp. v. Voinovich,* 911 F.Supp. 1051, 1058 (S.D.Ohio 1995) (finding plaintiff doctors' challenge to state ban of D & X abortions "ripe for decision because a doctor facing criminal penalties for performing abortions may sue for pre-enforce-

ment review of the relevant statute" (citing *Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973))), *aff'd,* 130 F.3d 187 (6th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1347, 140 L.Ed.2d 496 (1998).

### 3. *Pullman* Abstention

■ Finally, the Legislature submits that this Court must refrain from adjudicating plaintiffs' claim pursuant to *Railroad Commission of Texas v. Pullman,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). "*Pullman* abstention allows federal courts, in rare cases, to abstain from deciding a case if a state court's resolution of a state law issue would obviate the need for the federal court to reach a federal constitutional issue." *Artway v. Attorney General of N.J.,* 81 F.3d 1235, 1270 (3d Cir.1996). The doctrine is intended to serve three purposes: (1) to avoid needless "friction" between federal and state judiciaries; (2) to reduce the likelihood of erroneous interpretations of state law; and (3) to avoid unnecessary constitutional rulings. *Pullman,* 312 U.S. at 499–501; *see also United States v. City of Pittsburgh,* 757 F.2d 43, 45 (3d Cir.1985) (offering as the two basic purposes for *Pullman* abstention "the avoidance of unnecessary constitutional pronouncements, and the avoidance of undue interference with sensitive state programs"). "*Pullman* abstention 'is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it ... [and is] justified ... only ... in exceptional circumstances.'" *Artway,* 81 F.3d at 1270 (quoting *Colorado River Water Conserv. Dist. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)).

In the Third Circuit, three such "exceptional circumstances" must exist before a court may abstain pursuant to *Pullman:*

First, there must be uncertain issues of state law underlying the federal constitutional claims brought in the federal court. Second, these state law issues

must be amenable to an interpretation by the state courts that would obviate the need for or substantially narrow the scope of the adjudication of the constitutional claims. And third, it must appear that an erroneous decision of state law by the federal court would be disruptive of important state policies.

*D'Iorio v. County of Delaware,* 592 F.2d 681, 686 (3d Cir.1978), *overruled in part on other grounds, Kershner v. Mazurkiewicz,* 670 F.2d 440, 448 (3d Cir.1982). If all three circumstances are present, the district court must determine whether abstention is consistent with equity "by weighing such factors as the availability of an adequate state remedy, the length of time the litigation has been pending, and the impact of delay on the litigants." *Artway,* 81 F.3d at 1270; *see also Coast Cities Truck Sales, Inc. v. Navistar Internat'l Transp. Co.,* 912 F.Supp. 747, 780 (D.N.J. 1995).

Uncertainty of state law underlies plaintiffs' challenge to the Act on vagueness grounds. Although this uncertainty would ordinarily militate in favor of abstention, the Supreme Court has made clear that "not every vagueness challenge to an uninterpreted state statute or regulation constitutes a proper case for abstention." *Procunier v. Martinez,* 416 U.S. 396, 401, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), *overruled in part on other grounds, Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). The *Procunier* Court went on to explain:

> Where the case turns on the applicability of a state statute or regulation to a particular person or a defined course of conduct, resolution of the unsettled question of state law may eliminate any need for constitutional adjudication. Abstention is therefore appropriate. Where, however, as in this case, the statute or regulation is challenged as vague because individuals to whom it plainly applies simply cannot understand what is required of them and do not wish to forswear all activity arguably

within the scope of the vague terms, abstention is not required. In such a case no single adjudication by a state court could eliminate the constitutional difficulty. Rather it would require "extensive adjudications, under the impact of a variety of factual situations," to bring the challenged statute or regulation "within the bounds of permissible constitutional certainty."

*Id.* at 401 n. 5 (citations omitted). Plaintiffs' challenge falls into the latter category, making abstention inappropriate in this case.

The Act is challenged as vague because plaintiffs, individuals and entities to whom the Act clearly applies, allege that they cannot understand what is proscribed. As a result, plaintiffs contend they will be required to stop performing constitutionally-permissible abortion procedures, arguably within the scope of the Act's vague terms, in order to avoid license revocation and fines. Given the array of possible factual situations in which vagueness of the Act may be an issue, no single adjudication by a New Jersey state court could eliminate the constitutional question. *See id.; see also United States v. City of Pittsburgh,* 757 F.2d 43, 45 (3d Cir.1985) ("[T]he mere possibility that a constitutional adjudication may be avoided by a state court interpretation of state law, by itself, is insufficient reason to require abstention."); ERWIN CHEMERINSKY, FEDERAL JURISDICTION § 12.2, at 693 (1994) (noting that abstention is appropriate in vagueness cases "only if there is a substantial possibility that the state court could provide a narrowing construction that would save the statute from being invalidated").

Because the Act is not susceptible to a state court interpretation which would render unnecessary or substantially limit the federal constitutional question, it is this Court's duty to exercise its jurisdiction. *See Marks v. Stinson,* 19 F.3d 873, 882–83 n. 6 (3d Cir.1994), *cert. denied,* 513 U.S. 1111, 115 S.Ct. 901, 130 L.Ed.2d 785 (1995). Abstention is especially inappro-

priate here because plaintiffs do not challenge the Act solely on vagueness grounds. *See Procunier*, 416 U.S. at 401–02.

### C. Vagueness

Plaintiffs argue that the Act is unconstitutionally vague because key terms of the Act's definition of "partial-birth abortion" are susceptible to multiple interpretations. Plaintiffs suggest that, by failing to adequately define "substantial portion," "partially vaginally deliver," and "living," the Legislature has left those individuals and entities subject to the Act's penalties without fair warning of the proscribed conduct and the Act open to arbitrary and discriminatory enforcement. The Legislature counters that the Act utilizes commonly-understood words and states plainly what conduct is prohibited.

To comport with due process, a statute must give fair warning as to what conduct is forbidden. *See Village of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *Colautti v. Franklin*, 439 U.S. 379, 390, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979), *overruled in part on other grounds*, *Webster v. Reproductive Health Servs.*, 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989); *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Without such a warning, people "steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S. at 109 (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964)). For this reason, a "statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must neces-

sarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Smith v. Goguen*, 415 U.S. 566, 572 n. 8, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974) (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)). A statute is also void for vagueness if it lacks sufficient standards of application such that it is open to arbitrary and discriminatory enforcement. *See Grayned*, 408 U.S. at 108. Such a law "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.*

■ A higher degree of clarity is required when "uncertainty induced by the statute threatens to inhibit the exercise of constitutionally protected rights." *Colautti*, 439 U.S. at 391; *see also Hoffman Estates*, 455 U.S. at 499 ("[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights."). A statute will be struck as unconstitutionally vague for failure to satisfy this heightened standard, even if it "could conceivably have had some valid application." *Kolender v. Lawson*, 461 U.S. 352, 358–59 n. 8, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *see also Hoffman Estates*, 455 U.S. at 494–95; *Colautti*, 439 U.S. at 390–91; *Planned Parenthood of Wis. v. Doyle*, 162 F.3d 463, 469 (7th Cir.1998) ("[A] statute that punishes a class of constitutionally punishable abortions so vaguely that it makes doctors afraid to perform constitutionally permissible abortions is quite likely to infringe constitutional rights.").[2]

---

**2.** The Legislature contends that a facial challenge to the Act is inappropriate and that plaintiffs may challenge the Act only to the extent that it applies to them. Supreme Court precedent does not so limit plaintiffs to an "as applied" challenge. In *Kolender*, a case involving how vagueness of a particular statute impacted First Amendment and freedom of movement liberties, Justice O'Connor

explained why a facial challenge was appropriate:

> In his dissent, Justice White claims that "[t]he upshot of our cases ... is that whether or not a statute purports to regulate constitutionally protected conduct, it should not be held unconstitutionally vague on its face unless it is vague in all of its possible applications." The description of our hold-

The Act bans "partial-birth abortions." As defined in the Act, a "partial-birth abortion" is "an abortion in which the person performing the abortion partially vaginally delivers a living human fetus before killing the fetus and completing the delivery." N.J. Stat. Ann. § 2A:65A6(e). The Act further defines "vaginally delivers a living human fetus before killing the fetus" as "deliberately and intentionally delivering into the vagina a living fetus, or a substantial portion thereof, for the purpose of performing a procedure the physician or other health care professional knows will kill the fetus, and the subsequent killing of the human fetus." N.J. Stat. Ann. § 2A65A–6(f). Any vagueness analysis must focus on these definitions. The Court finds that, because persons of ordinary intelligence must guess at the meaning of phrases such as "partially vaginally delivers," "living," and "substantial portion," the Act is void for vagueness.

The phrase "partially vaginally delivers," as it is used in the Act, is subject to more than one reasonable interpretation. In common usage, the term "deliver" means simply "to give birth to." Webster's Third New International Dictionary 597 (1976). However, in obstetrics, "deliver" has a broader meaning and is used to refer "to bring[ing] out through the cervix, out of the uterus, out of the woman." [3] Modifying "deliver" with "vaginally" merely stresses that the physician must bring out through the vagina. Two interpretations of the phrase "partially vaginally delivers" emerge. "Partially vaginally delivers" may describe, as the Legislature contends, the situation where an intact fetus is delivered in part through the vagina. The phrase may also encompass the situation where a fetal part is delivered through the vagina.

In so finding, the Court rejects the Legislature's suggestion that the use of the term "birth," in "partial-birth abortion,"

ings is inaccurate in several respects. First, it neglects the fact that we permit a facial challenge if a law reaches "a substantial amount of constitutionally protected conduct." Second, where a statute imposes criminal penalties, the standard of certainty is higher.
*Kolender v. Lawson*, 461 U.S. 352, 358–59 n. 8, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (citations omitted). The *Kolender* Court states plainly that facial challenges are permitted "if a law reaches 'a substantial amount of constitutionally protected conduct.' " *Id.; see also Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 494–95, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1981) (noting that only where a statute "implicates no constitutionally protected conduct" must the plaintiff prove that "the enactment is impermissibly vague in all of its applications").

This Court does not, as the Legislature suggests, read *Kolender* as limiting facial challenges to the First Amendment context or to cases involving criminal statutes. While it is true that, outside the First Amendment context, a vagueness challenge " 'must be examined in the light of the facts of the case at hand,' " *Hoffman Estates*, 455 U.S. at 495 n. 7, 102 S.Ct. 1186 (quoting *United States v. Mazurie*, 419 U.S. 544, 550, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975)), this does not suggest that facial challenges to statutes not involving First Amendment freedoms are not permitted.

Rather, it suggests that the Court must consider facial challenges to statutes not impacting First Amendment freedoms on a case-by-case basis and should permit such challenges to proceed if the statute "reaches 'a substantial amount of constitutionally protected conduct.' " *Kolender*, 461 U.S. at 359 n. 8, 103 S.Ct. 1855. The Court concludes that this threshold is met in this case. This conclusion is consonant with the holdings of other courts in the partial-birth abortion context. *See, e.g., Planned Parenthood of Wis. v. Doyle*, 162 F.3d 463, 469 (7th Cir.1998); *Women's Med. Prof. Corp. v. Voinovich*, 130 F.3d 187, 197 (6th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1347, 140 L.Ed.2d 496 (1998).

3. Dr. Holmes admitted knowing of no medical literature that refers to the suctioning out of uterine contents during an abortion as a "delivery." Likewise, Drs. Boehm and Bowes testified that "deliver" is not used in medical literature to describe the removal of fetal parts during an abortion. However, despite their testimony to the contrary, each of the witnesses, including Drs. Boehm and Bowes for the Legislature, continuously used the term "deliver" and "delivery" when discussing abortion practice. The Court finds this continued usage to be a more trustworthy guide than carefully constructed answers to carefully constructed questions.

renders the latter interpretation unreasonable. "Birth" is defined as "the emergence of a new individual from the body of its parent." *Id.* at 221. The Legislature contends that this definition is not consistent with the extraction of fetal parts. While this may be true, the extraction of fetal parts is consistent with the definition provided by the Legislature in the Act. As used in the Act, the term "birth" is only part of the term "partial-birth abortion," which is defined as "an abortion in which a person performing the abortion partially vaginally delivers a living human fetus before killing the fetus and completing the delivery." It is this definition which permits at least two reasonable interpretations: the delivery of an intact fetus in part through the vagina or the delivery of a fetal part through the vagina. *See Hope Clinic v. Ryan,* 995 F.Supp. 847, 855 n. 1 (N.D.Ill.1998) ("We refuse to read another definition into the statute when the term at issue is already defined within the statute. It is from the definitions within the statute that we draw the statute's meaning.").

The Act's use of the phrase "living human fetus" is consistent with both of these interpretations. The term "living" means "having life." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1324 (1976). "Life" is defined as "the quality that distinguishes a vital and functional being from a dead body ... characterized by the capacity to perform certain functional activities including metabolism, growth, reproduction, and some form of responsiveness or adaptability." *Id.* at 1306. Each expert who testified at the hearing agreed that "living," as it is used in the medical profession, means having a heartbeat, a vital sign that is detectable as early as the seventh week lmp. A "fetus," as defined by one dictionary, is "a developing human from ... three months after conception to birth." *Id.* at 842. Furthermore, as Drs. Weiss and Holmes testified, physicians refer to a pregnancy as a "fetus," rather than as an embryo, from the seventh to ninth week lmp until birth. That the Act bans procedures performed as early as seven weeks lmp is consonant with the lack of a viability requirement.[4] There is also no requirement that the fetus be intact at the time of the prohibited conduct. The Court does not find persuasive the Legislature's argument that use of the phrase "living human fetus" necessarily implies an intact fetus. A fetus may be "living," *i.e.,* have a heartbeat, despite disarticulation.[5] Thus, in the absence of further definition in the Act, "living human fetus" may be reasonably

---

**4.** As defined by the Supreme Court, "the concept of viability ... is the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb." *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 870, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (citing *Roe v. Wade,* 410 U.S. 113, 163, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)); *see also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2548 (1976) (defining "viable" as the state of "having attained such form and development of organs as to be normally capable of living outside the uterus"). Dr. Weiss also gave a useful definition, explaining that "[v]iable means having the ability to independently function out of the uterus, be able to be removed and live, be put in an incubator and go home .... usually occur[ing] after the 24th week of pregnancy and after the fetus reaches 500 grams, which is a little bit more than a pound."

The Legislature admits that the Act reaches procedures performed on pre-viable as well as viable fetuses. That the Act pertains to a fetus rather than an embryo and that the fetus must be "living" guarantees only that the fetus is at least seven weeks lmp; such terminology does not suggest a later stage of pregnancy. Thus, perhaps contrary to popular understanding, *see* Laura L. Hirschfeld, *Moral Dilemmas for the Judiciary at the Millennium: Partial–Birth Abortion and Physician–Assisted Suicide,* 19 CARDOZO L.REV. 1061, 1066 (1997) ("Partial-birth abortion, by definition, takes place in the third trimester of the human gestational period, typically long past viability."), "partial-birth abortions," even by the Legislature's definition, may be performed during the first or second trimester, well before viability.

**5.** Even defense expert Dr. Boehm explained that "the word 'living fetus,' to me, represents an intact, the entire fetus, or certainly if not the entire fetus, the significant substantial portion of that fetus."

interpreted as a human fetus, from as early as seven weeks lmp until birth, either *intact or disarticulated, which retains* a heartbeat.

The "substantial portion" language only compounds the vagueness problem. Use of "substantial portion thereof" feeds confusion about whether the fetus must be intact. That is, the phrase may be read to require whole or partial delivery into the vagina of an intact living fetus. Conversely, the language may be read to provide for the situation where a "substantial portion" of the fetus is delivered into the vagina, disarticulated from the remainder of the fetus which remains in the uterus with a heartbeat. The phrase also creates new confusion over what constitutes a "substantial portion." The breadth of what men of ordinary intelligence might consider a "substantial portion" to be is indicated by the expert testimony received in this case. Definitions ranged from "any part of the fetus" to "any part of my body that was removed that I would miss . . . . certainly a limb" to "a breech delivery, up to the thorax."

During almost every conventional abortion procedure,[6] an intact fetus with a heartbeat may be delivered in part into the vagina or a substantial fetal part may be delivered into the vagina while the remainder of the fetus is in the uterus with a heartbeat. In a suction curettage abortion, the cannula is placed through the vagina and cervix and into the uterus. The fetus may come through the cannula either intact or disarticulated. Part of the intact fetus may be in the vagina and part in the uterus, or a disarticulated part of the fetus may be in the vagina while the remainder of the fetus is in the uterus. In either of these situations, the fetus may still have a heartbeat. Whatever step the physician takes next, before completing the delivery, may kill the fetus. Suction

curettage would thus come within the Act's definition of a "partial-birth abortion."

In a D & E abortion, the physician uses suction and forceps to remove the fetus, either intact or disarticulated. During evacuation of the uterus, part of the intact fetus may be in the vagina and part in the uterus or a disarticulated part of the fetus may be in the vagina while the remainder of the fetus is in the uterus. The fetus may still have a heartbeat. Alternatively, it may happen that the physician grasps the fetus by the feet or legs and draws the fetus intact through the cervix and into the vagina until the fetal head lodges in the internal cervical os. At this point, the fetus may still have a heartbeat. In any of these situations, the next step taken by the physician, before completing the delivery, may kill the fetus. This would bring the D & E within the Act's definition of a "partial-birth abortion."

Finally, during any induction or installation abortion, it is possible that the fetus will become entangled in the umbilical cord, that the fetal head will become lodged in the internal cervical os, or that some other complication, such as maternal hemorrhaging, will occur. In any of these situations, the fetus may still have a heartbeat and may be positioned partially in the uterus and partially in the vagina. Any subsequent step taken by the physician before completing the delivery, e.g., cutting the umbilical cord, disarticulating or deflating the fetal head, could kill the fetus. An induction might then qualify as a "partial-birth abortion" under the Act.

Because the phrases "partially vaginally delivers," "living human fetus," and "substantial portion" have more than one interpretation, those subject to the penalties of the Act cannot, with any certainty, determine what conduct is prohibited. As a

---

6. Under the Court's interpretation of the Act, the only conventional abortion procedures which could never qualify as "partial-birth abortions" are hysterectomies and hysterotomies. During these procedures, the fetus is delivered through an abdominal incision, not the vagina. Because "partial-birth abortions" require vaginal delivery, the procedures simply can not qualify.

result, they may steer far wider of the unlawful zone, *see Grayned v. City of Rockford*, 408 U.S. 104, 109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), and refuse to perform many conventional abortion procedures, *e.g.*, suction curettage, D & E and induction abortions, even if the Legislature did not intend to proscribe those procedures. This lack of precision also leaves the Act open to arbitrary and discriminatory enforcement. *Id.* at 108–09. Given that the Act "threatens to inhibit the exercise of constitutionally protected rights," *Colautti v. Franklin*, 439 U.S. 379, 391, 99 S.Ct. 675, 58 L.Ed.2d 596 (1978), *overruled in part on other grounds, Webster v. Reproductive Health Servs.*, 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989), such vagueness cannot be tolerated.

Because this Court finds the Act to be constitutionally infirm due to its use of "partially vaginally delivers," "living human fetus," and "substantial portion," there is no need to address at length the Legislature's reliance on the Act's use of "procedure" and "subsequent killing." Suffice it to say, it is the Court's understanding that performance of an abortion is unique. Names are given to certain types of abortion methods, but each time those methods are performed, their progression depends on the particulars of the physician and the patient. The physician cannot know, before the abortion begins, what steps will be necessary and she cannot know, during or after the abortion, where and when fetal demise occurs, unless the fetus is still living upon delivery. All that is certain is that the physician intends to terminate the pregnancy in the

safest way possible for the mother. In this context, it becomes clear that the Legislature's reliance on "procedure" and "subsequent killing" to inject clarity into the Act is misplaced. These terms merely require that, during an abortion procedure, while the fetus or a "substantial portion" of the fetus is partly in the uterus and partly in the vagina, the physician does something which she knows may cause fetal death, if the fetus has not already died. This situation may occur during any conventional abortion procedure, except a hysterectomy or hysterotomy.[7]

■ The Court also finds unconvincing the Legislature's suggestion that the Act's scienter requirement cures its vagueness problems. A scienter requirement may, in some cases, alleviate a vagueness problem. In *Colautti*, the Supreme Court found an abortion statute's vagueness compounded by its lack of a scienter requirement and noted that such a requirement " 'may avoid those consequences to the accused which may otherwise render a vague or indefinite statute invalid.' " *Colautti*, 439 U.S. at 395 n. 13 (quoting *Screws v. United States*, 325 U.S. 91, 101, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945)). The Court went on to explain:

> "The requirement that the act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain. But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware."

*Id.* (quoting *Screws*, 325 U.S. at 102). This qualification is significant. Certainly, "[a] scienter requirement cannot eliminate

---

7. In *Richmond Medical Center for Women v. Gilmore*, 11 F.Supp.2d 795, 818 (E.D.Va.), *prelim. injunction stayed*, 144 F.3d 326 (4th Cir.1998), the district court rejected defendants' attempt "to distinguish the D & E procedure from the D & X procedure by stating that, in the D & E procedure, the 'killing' of the fetus is a one-step process, whereas in the D & X procedure, the fetus is (1) brought into the vagina and then, (2) the fetus is killed." In rejecting this argument, the Court reasoned:

> This sequencing theory does not assist the defendants on the vagueness issue because the Act does not confine its proscriptions to a procedure which "kills" the fetus in the vagina, nor does it distinguish on its face between a procedure where the fetus is killed in "one step" as opposed to "two steps."

*Id.* The Legislature has raised a similar argument and this Court agrees with the reasoning of the district court in *Gilmore* that it is not tenable given the Act's language.

vagueness ... if it is satisfied by an 'intent' to do something that is in itself ambiguous." *Nova Records, Inc. v. Sendak,* 706 F.2d 782, 789 (7th Cir.1983); *see also Sewell v. Georgia,* 435 U.S. 982, 987, 98 S.Ct. 1635, 56 L.Ed.2d 76 (1978) (Brennan, J., dissenting) (remarking that scienter requirement should not save an otherwise unconstitutionally vague statute where requirement "provides no reasonable assurance that persons will know or ought to know when they are likely to violate" the statute); *United States v. Corrow,* 119 F.3d 796, 804 n. 11 (10th Cir.1997) ("We do not say that a scienter requirement alone will rescue an otherwise vague statute, recognizing 'it is possible willfully to bring about certain results and yet be without fair warning that such conduct is proscribed.' " (quoting 1 W. LaFave & A. Scott, Jr., Substantive Criminal Law § 2.3, at 131 (1986))), *cert. denied,* —— U.S. ——, 118 S.Ct. 1089, 140 L.Ed.2d 146 (1998); *Record Head Corp. v. Sachen,* 682 F.2d 672, 677–78 (7th Cir.1982) (finding ordinance unconstitutionally vague on the basis that its scienter requirement was circular and nonclarifying); Note, *The Void-for-Vagueness Doctrine in the Supreme Court,* 109 U. Pa. L.Rev. 67, 87 n. 98 (1960) (noting that the scienter requirement "must envisage not only a knowing what is done but a knowing that what is done is unlawful or, at least, so 'wrong' that it is probably unlawful"). To hold otherwise would be to suggest that a legislature may avoid vagueness challenges altogether by simply including a scienter requirement in every enactment.

Inclusion of a scienter requirement does not alleviate the Act's vagueness problems. The Act requires that the person performing the abortion

> *deliberately and intentionally* deliver[ ] into the vagina a living fetus, or a substantial portion thereof, *for the purpose of* performing a procedure the physician or other health care professional *knows* will kill the fetus, and the subsequent killing of the fetus.

N.J. Stat. Ann. § 2A:65A–6(f) (emphasis added). This scienter requirement does not render more certain that language which renders the statute vague. As a result, the requirement fails to alleviate the Act's vagueness because "it is satisfied by an 'intent' to do something that is in itself ambiguous." *Nova Records, Inc. v. Sendak,* 706 F.2d 782, 789 (7th Cir.1983); *see also Little Rock Family Planning Servs., P.A. v. Jegley,* No. 97–581, slip op. at 41–42 (E.D.Ark. Nov. 13, 1998) (rejecting defendant's argument that intent requirement cures partial-birth abortion ban's vagueness); *Planned Parenthood of Greater Iowa, Inc. v. Miller,* 1 F.Supp.2d 958, 962 (S.D.Iowa 1998) (same).

That the Act should be struck as unconstitutionally vague finds support in the caselaw from the vast majority of federal district and circuit courts which have considered vagueness challenges in the partial-birth abortion context. *See Planned Parenthood of Wis. v. Doyle,* 162 F.3d 463, 469–70 (7th Cir.1998) (directing district court to enter preliminary injunction); *A Choice for Women v. Butterworth,* No. 98–774, slip op. at 20–25 (S.D.Fla. Nov. 23, 1998) (permanent injunction); *Intermountain Planned Parenthood v. Montana,* No. 97–477, slip op. at 7–11 (D. Mont. June 29, 1998) (same); *Miller,* 1 F.Supp.2d at 961–62 (preliminary injunction); *Brancazio v. Underwood,* No. 98–495, slip op. at 3 (S.D.W. Va. June 11, 1998) (temporary restraining order); *Hope Clinic v. Ryan,* 995 F.Supp. 847, 853–56 (N.D.Ill.1998) (preliminary and permanent injunction); *Planned Parenthood of So. Ariz., Inc. v. Woods,* 982 F.Supp. 1369, 1378–79 (D.Ariz.1997) (same); *Carhart v. Stenberg,* 11 F.Supp.2d 1099, 1131–32 (D.Neb.1998) (permanent injunction); *Evans v. Kelley,* 977 F.Supp. 1283, 1304–11 (E.D.Mich.1997) (same); *Causeway Med. Suite v. Foster,* No. 97–2211, slip op. at 1 (E.D.La. July 21, 1997) (temporary injunction); *Rhode Island Med. Soc. v. Pine,* No. 97–416, slip op. at 1 (D.R.I. July 11, 1997) (temporary restraining order); *see also Women's Med. Prof. Corp. v. Voinovich,* 911 F.Supp. 1051,

1063–67 (S.D.Ohio 1995) (finding ban on "Dilation and Extraction" unconstitutionally vague because its definition includes the D & E abortion procedure), *aff'd*, 130 F.3d 187, 198–200 (6th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1347, 140 L.Ed.2d 496 (1998); *cf. Summit Med. Assoc., P.C. v. James*, 984 F.Supp. 1404, 1437–38 (M.D.Ala.1998) (certifying questions to the state supreme court regarding what abortion procedures the partial-birth abortion ban reaches); *Planned Parenthood of Alaska, Inc. v. Alaska*, No. 97–6019, slip op. at 6–12 (Alaska Super.Ct. Mar. 13, 1998) (permanently enjoining partial-birth abortion ban as void-for-vagueness under provisions of Alaska State Constitution).[8]

The Act fails to define with any certainty the conduct that is proscribed and, as a result, leaves the Act open to "arbitrary and discriminatory enforcement." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). The Court acknowledges the difficulty faced by the Legislature in defining conduct which had earned no recognized medical name at the time of enactment.[9] However, the Court cannot accept the Legislature's argument that, had it wished to prohibit conventional abortion procedures, *e.g.*, suction curettage, D & E and induction abortions, it would have expressly done so. As the Legislature readily admits, it was "quite capable of employing such terminology" and, as such, was quite capable of expressly excluding such procedures from the Act's proscription. *See, e.g.*, OHIO REV.CODE ANN. § 2919.15(A) (excluding suction curettage and suction aspiration abortion procedures specifically from definition of prohibited conduct). This it did not do. Lack of a recognized medical term for an objectionable procedure is no fault of the Legislature, but failure to give fair warning is the flaw of draftsmanship.[10] The Act will be struck as unconstitutionally vague.

### D. Undue Burden

Plaintiffs also contend that the Act unduly burdens the woman's constitutional right to obtain an abortion because its language covers many conventional abortion methods and because it contains no health exception and an inadequate life exception. In response, the Legislature argues that *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and *Planned Parenthood of Southeastern*

---

**8.** The Court chooses not to follow the minority of courts which have not found the language of similar partial-birth abortion statutes to be vague. *See Richmond Med. Ctr. for Women v. Gilmore*, 144 F.3d 326, 328–332 (4th Cir.1998) (staying preliminary injunction issued by district court on basis that partial-birth abortion ban was not vague and therefore plaintiffs, who performed only conventional abortions, had no standing to seek injunctive relief); *Midtown Hosp. v. Miller*, 36 F.Supp.2d 1360 (N.D.Ga.1997) (denying temporary restraining order).

**9.** The Legislature need not use medical terminology in order to ban certain medical procedures. However, it is practically impossible to evaluate the vagueness of "partial-birth abortion" as a purely legal term where the Act purports to ban certain medical procedures by medical personnel and charges medical professionals with judging violations of the statute. In this context, definitions ascribed by the medical community to terms

used in the Act are certainly relevant to this Court's vagueness analysis.

**10.** One district court has gone so far as to suggest the legislature utilized vague terms with the purpose of chilling protected activity:

> The legislature focused directly on protected activity in a manner which everyone knew might be unconstitutional. The legislature could have passed a statute of more limited reach and still achieved its supposed objective. Instead, it decided to go farther. Indeed as is sometimes the case in controversial issues, the legislature seems to have striven for, in Justice Frankfurter's words, a "purposeful ambiguity." That is quite a different purpose than the one suggested by Defendants.

*Eubanks v. Stengel*, 28 F.Supp.2d 1024, 1036 (W.D.Ky.1998). Stopping short of ascribing such a motive to the Legislature, this Court simply notes that the Legislature could have been more precise in drafting the "partial-birth abortion" legislation.

*Pennsylvania v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), do not control because a "partial-birth abortion" is a form of infanticide rather than an "abortion" within the meaning of those cases. Alternatively, the Legislature argues that, even if *Casey* and *Roe* control, the Act does not place an undue burden on plaintiffs because conventional abortions are not banned and because the dilatation and extraction abortion procedure, the only procedure banned under the Act, is never necessary to preserve the life or health of the woman, obviating the need for such exceptions.

In *Casey,* the Supreme Court reaffirmed the essential holding of *Roe* that women have a constitutional right "to choose to have an abortion before viability and to obtain it without undue interference from the State." *Casey,* 505 U.S. at 846, 112 S.Ct. 2791. The Court also reaffirmed *Roe*'s holding that states have legitimate interests "in protecting the health of the woman and the life of the fetus" and may, in promoting these interests, "restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger the woman's life or health." *Id.* However, a plurality of the Court rejected *Roe*'s trimester framework on the basis that "it undervalue[d] the State's interest in potential life," *id.* at 873, 112 S.Ct. 2791, and adopted, instead, the "undue burden" standard:

> [W]e abandon the trimester framework as a rigid prohibition on all previability regulation aimed at the protection of fetal life.... The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate

it. Only where state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause.

*Id.* at 873–74, 112 S.Ct. 2791. The plurality explained that an abortion regulation will constitute an undue burden if it "has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877, 112 S.Ct. 2791. This standard, the plurality determined, appropriately "reconcil[es] the State's interest with the woman's constitutionally protected liberty." *Id.* at 876, 112 S.Ct. 2791.

Plaintiffs' challenge to the Act is properly considered under the standards established in *Roe* and *Casey.* The Legislature's argument that the Act is not governed by *Roe* or *Casey,* because those cases recognize the woman's right to "terminate her pregnancy," *Roe,* 410 U.S. at 153, 93 S.Ct. 705, not the woman's right to kill a fetus which is partially-born, or outside of the uterus, is untenable. The Supreme Court drew the line at viability, not at the uterus. *See Casey,* 505 U.S. at 870, 112 S.Ct. 2791. It is not for this Court to question that decision.[11]

Other courts considering this argument have reached the same conclusion. In *Carhart v. Stenberg,* 972 F.Supp. 507, 529 (D.Neb.1997), the court rejected defendants' claim that *Roe* and *Casey* should not apply in the partial-birth abortion context because there is no recognized " 'constitutional right to kill a partially born human being' " on the basis that the Supreme Court has used viability as its benchmark for evaluating abortion regulations:

> fetal demise may occur outside the uterus during all conventional abortion procedures. *See supra* pp. 491–92. Thus, the Legislature's interpretation of *Roe* and *Casey* could potentially exclude all conventional abortion procedures from constitutional protection.

**11.** The Court shares plaintiffs' concern that, if *Roe* and *Casey* were given such a limited interpretation, *i.e.,* to protect the woman's right to an abortion only if fetal demise occurs in utero, such interpretation would, for all practical purposes, nullify the right. As the testimony in this case has established,

*Roe* and *Casey* categorized fetuses as viable or not viable. No case with which we are familiar used the "partially born human being" category as a construct for constitutional analysis. It is our job to fairly apply the precedents of the Supreme Court whether we agree with them or not. Accordingly, we decline the defendants' invitation to ignore *Roe* and *Casey.*

*Id.* (citation omitted). In *Richmond Medical Center for Women v. Gilmore,* 11 F.Supp.2d 795 (E.D.Va.), *prelim. injunction stayed,* 144 F.3d 326 (4th Cir.1998), the court, considering lack of a health exception to the state's partial-birth abortion ban, rejected a similar argument:

The defendants seek to excuse this ostensibly fatal defect by asserting the rather unusual view that *Roe* and *Casey* are inapplicable because, in those decisions, the Supreme Court did not announce constitutional protections to abortions where "the child is partially born." The Court declines the State's invitation to circumvent the requirements of *Roe* and *Casey.*

Simply put, *Roe* and *Casey* established the line of demarcation for a State's ability to regulate and proscribe abortion in terms of whether the fetus was viable or nonviable, not in terms of whether a fetus was in the process of being born. The defendants' argument, therefore, reduces itself to the premise that a district court can make an unprecedented distinction between a woman's right to terminate a non-viable fetus in utero and a non-viable fetus in the birthing canal.

... [I]t is not for this Court to upset the balance struck in *Roe* and *Casey* between two very important sets of competing rights and interests.

*Id.* at 822 (citation omitted); *see also Little Rock Family Planning Servs., P.A. v. Jegley,* No. 97–581, slip op. at 51–52 (E.D.Ark. Nov. 13, 1998) (rejecting defendants' argument "that *Roe* and *Casey* do not apply because 'both cases concerned killing of the "unborn" and not the killing of the partially born' "); *Planned Parenthood of So. Ariz. v. Woods,* 982 F.Supp. 1369, 1377 (D.Ariz.1997) (declining defendants' invitation to characterize extrauterine fetal death as infanticide rather than abortion). More recently, in *Planned Parenthood of Wisconsin v. Doyle,* 162 F.3d 463, 471 (7th Cir.1998), the Seventh Circuit also dispensed with this "outside-*Roe* " argument and, in doing so, addressed the Legislature's concern that striking the Act in this case will condone infanticide:

We also do not doubt that if in the course of a normal labor the mother asked her obstetrician to kill the baby in the birth canal and he did so, the state could criminalize this act as infanticide. But here, to repeat, the state has criminalized merely a procedure, and acknowledged the right to abort by an alternative procedure the same fetus whose death by partial birth abortion would subject the doctor to punishment as a murderer. So there is no issue of infanticide, of killing a live baby that is half-born.

*Id.* (citation omitted). This Court agrees that *Roe* and *Casey* control in this case.

*Casey* also provides the governing standard for reviewing plaintiffs' facial challenge to the Act. The Court rejects the Legislature's suggestion that, pursuant to *United States v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), plaintiffs' facial claim must be dismissed for failure to establish that the Act has no constitutional application. In *Salerno,* the Court held that, in order to successfully challenge a statute on its face, "the challenger must establish that no set of circumstances exists under which the Act would be valid." *Id.* at 745, 107 S.Ct. 2095. However, the *Casey* Court signaled a departure from *Salerno* in the abortion context when it held unconstitutional an abortion regulation which, "in a large fraction of the cases in which [the regulation wa]s relevant, ... operate[d] as a substantial obstacle to a woman's choice to undergo an

abortion." *Casey,* 505 U.S. at 895, 112 S.Ct. 2791. Since *Casey,* a majority of the courts which have considered the issue have concluded that the plurality adopted this "large fraction" standard to govern facial challenges to abortion statutes. *See, e.g., Women's Med. Prof. Corp. v. Voinovich,* 130 F.3d 187, 193–97 (6th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1347, 140 L.Ed.2d 496 (1998); *Richmond Med. Ctr. for Women v. Gilmore,* 11 F.Supp.2d 795, 819–20 (E.D.Va.), *prelim. injunction stayed,* 144 F.3d 326 (4th Cir.1998); *Little Rock Family Planning Servs., P.A. v. Jegley,* No. 97–581, slip op. at 45–46 (E.D.Ark. Nov. 13, 1998); *Eubanks v. Stengel,* 28 F.Supp.2d 1024, 1030 (W.D.Ky.1998); *Hope Clinic v. Ryan,* 995 F.Supp. 847, 859–60 (N.D.Ill.1998); *Summit Med. Assoc., P.C. v. James,* 984 F.Supp. 1404, 1449, 1451–54 (M.D.Ala.1998). The Third Circuit has indicated its place in this majority. *See Casey v. Planned Parenthood of Southeastern Pa.,* 14 F.3d 848, 863 n. 21 (3d Cir.) (stating in dicta that "the [Supreme] Court has, in this case, set a new standard for facial challenges to pre-viability abortion laws" by requiring "only that a plaintiff show an abortion regulation would be an undue burden 'in a large fraction of the cases' "), *stay denied,* 510 U.S. 1309, 114 S.Ct. 909, 127 L.Ed.2d 352 (1994). This Court agrees that the Act's constitutionality depends on whether, "in a large fraction of the cases in which [the Act] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey,* 505 U.S. at 895, 112 S.Ct. 2791. Even if the Act has some constitutional application, it must be struck as unconstitutional if it is contrary to *Casey.*[12]

Reviewing the Act in light of *Roe* and *Casey,* the Court finds two reasons that it imposes an undue burden on a woman's constitutional right to terminate her pregnancy. First, the Act's language is so vague that its effect is to ban most conventional abortion procedures without regard to the viability of the fetus. Second, the Act proscribes "partial-birth abortions" without providing a health or adequate life exception. For these reasons, the Act imposes an undue burden and is unconstitutional.

As discussed above, the Act has the potential effect of banning all conventional abortion procedures except hysterotomies and hysterectomies. *See supra* pp. 489–95. Because a physician cannot, with any certainty, determine what conduct is prohibited under the Act, she will stop performing suction curettage, D & E and induction abortions in order to avoid the equally unpredictable risk of license revocation and fines. Plaintiffs' testimony supports this concern. Drs. Weiss, Wallace and Holmes each testified that, if the Act goes into effect, they will "stop performing all abortions" to ensure that their conduct does not come within the Act's reach. Such abstention would require a woman living in New Jersey who wishes to terminate her pregnancy to have an unwanted child or, if resources allow, to travel to another state for the procedure. This latter alternative carries the attendant risks of impairing the doctor-patient relationship and increasing the risk to the woman's life due to delay. The Act chills physicians from performing most conventional abor-

---

12. *Casey* provides the governing standard for reviewing plaintiffs' facial challenge to the Act to the extent that the Act limits both pre-viability and post-viability abortions. *See Women's Med. Prof. Corp. v. Voinovich,* 130 F.3d 187, 196 (6th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1347, 140 L.Ed.2d 496 (1998); *Richmond Med. Ctr. for Women v. Gilmore,* 11 F.Supp.2d 795, 823 (E.D.Va.) ("It would seem to follow that, if a State may

proscribe abortion at viability only if the law provides exceptions for the health and life of the mother, any similar regulations governing a fetus at pre-viability also must include exceptions for the life and health of the mother."), *prelim. injunction stayed,* 144 F.3d 326 (4th Cir.1998); *Summit Med. Assoc., P.C. v. James,* 984 F.Supp. 1404, 1449–54 (M.D.Ala. 1998).

tion procedures and thereby imposes an undue burden on a woman's constitutional right to terminate a pregnancy.

There is no disagreement that physicians may avoid the Act's penalties by ensuring fetal demise in utero, not causing fetal death when the fetus is partially delivered into the vagina, or limiting their abortion practices to hysterectomies and hysterotomies. However, these options involve increased risks to the woman and thus do not eliminate the undue burden problem. If the fetus dies while wholly in the uterus, any subsequent procedure would not involve delivery of a "living human fetus" into the vagina. To ensure fetal demise in utero, a physician may inject a toxic substance, such as digitalis or potassium chloride, into the heart of the fetus, either through the vagina or the abdomen. However, this procedure carries the risk of hemorrhage or injection into the maternal blood stream, is painful and upsetting for the woman who is awake during the procedure, and is contraindicated for women who are obese. Although these injections appear to be routinely used in multi-fetal reductions,[13] few physicians are trained to perform the injections, which require coordination with sophisticated ultrasound equipment. The physician may attempt to entirely disarticulate the fetus or cut the umbilical cord in utero and wait for fetal death before proceeding, but repeated entry into the uterus with sharp instruments increases the risk of uterine perforation and hemorrhage and increases the potential for leaving sharp fetal parts in the uterus. Saline installation abortions cause fetal demise in utero, but are medically inappropriate where labor would be contraindicated. *See supra* pp. 483–84. Whenever a procedure may cause fetal demise while the fetus is partially in the uterus and partially in the

vagina, the physician could avoid the Act by waiting until the fetus dies before completing the delivery.[14] However, partial evacuation prevents the uterus from contracting to expel what is left and to stop bleeding. Finally, physicians who wish to continue performing abortions without risking exposure under the Act may still perform hysterectomies and hysterotomies. However, these procedures carry enhanced risks of morbidity and mortality and hysterectomies render the woman sterile. *See supra* p. 484. Health risks to women would be significantly increased if physicians are required to ensure fetal demise in utero, avoid any step while a potentially living fetus is partially delivered into the vagina, or perform only hysterectomies and hysterotomies. By relegating physicians to the performance of more risk-laden abortion procedures, the Act imposes an undue burden on the woman's constitutional right to terminate her pregnancy. *See, e.g., Evans v. Kelley*, 977 F.Supp. 1283, 1318 (E.D.Mich., 1997).

Although decided prior to *Casey*, the Supreme Court's decision in *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), supports this conclusion. In *Danforth*, the Court considered that portion of a Missouri abortion statute which prohibited use of saline amniocentesis, an abortion procedure used after twelve weeks lmp. *Id.* at 75–76, 96 S.Ct. 2831. The evidence demonstrated that saline amniocentesis was employed in seventy percent (70%) of second trimester abortions. *Id.* at 76–77, 96 S.Ct. 2831. Hysterotomy and hysterectomy were argued to be "more dangerous and critical for the woman" than the saline technique, *id.* at 76, 96 S.Ct. 2831, and prostaglandin injection, determined by the

---

**13.** Dr. Wallace explained that such injections are sometimes used at the end of the first trimester to reduce multiple gestations, *i.e.*, "to reduce three, four or five fetuses to two." Such multi-fetal reductions involve injection of potassium chloride into the fetal chest cavity under ultrasound guidance.

**14.** Plaintiffs argue that, even if the physician waits in this situation until fetal death occurs, she "is still performing an act that would lead to the subsequent killing of the fetus that is the abortion." While this may be true, the Court finds it unnecessary to go this far.

district court to be safer, was still new and not yet available, *id.* at 77, 96 S.Ct. 2831. The Court determined that Missouri's ban on saline amniocentesis

would prohibit the use of a method which the record shows is the one most commonly used nationally by physicians after the first trimester and which is safer, with respect to maternal mortality, than even continuation of the pregnancy until normal childbirth. Moreover, as a practical matter, it forces a woman and her physician to terminate her pregnancy by methods more dangerous to her health than the method outlawed.

*Id.* at 78–79, 96 S.Ct. 2831. The Court concluded that the ban was "an unreasonable or arbitrary regulation designed to inhibit, and having the effect of inhibiting, the vast majority of abortions after the first 12 weeks" and, therefore, could "not withstand constitutional challenge." *Id.*

*Danforth* has been relied on in the partial-birth abortion context. In *Women's Medical Professional Corporation v. Voinovich,* 130 F.3d 187, 201 (6th Cir.1997), *cert. denied,* ──── U.S. ────, 118 S.Ct. 1347, 140 L.Ed.2d 496 (1998), the Sixth Circuit reasoned that the *Danforth* Court would have reached the same decision after *Casey,* because "a statute which bans a common abortion procedure would constitute an undue burden." Turning to Ohio's dilation and extraction abortion ban, the panel found the ban's definitional language to include "the D & E procedure, the most common method of abortion in the second trimester." *Id.* Because the ban reached the abortion procedure most commonly used during the second trimester, the panel concluded that it imposed an undue burden on the woman's right to obtain an abortion. *Id.; see also Evans v. Kelley,* 977 F.Supp. 1283, 1318 (E.D.Mich.1997) (relying on *Danforth* and *Voinovich* to hold that a partial-birth abortion ban which "leave[s] women with only far riskier alternatives to the D & E clearly impos-

es an undue burden on a woman's right to seek a pre-viability abortion").

In this case, the Court has concluded that the Act effectively bans suction curettage, D & E and induction abortions. As noted, ninety percent (90%) of all abortions are performed during the first trimester and, during this time, most physicians use the suction curettage procedure. *See supra* p. 482. More than eighty percent (80%) of second trimester abortions are D & E procedures, *see supra* pp. 482–83, and the vast majority of other second trimester abortions are done by induction, *see supra* p. 483. The Act therefore has the potential effect of banning the three most commonly used abortion procedures and "leave[s] women with only far riskier alternatives." *Id.; see supra* pp. 489–95. Accordingly, the Court holds that the Act "plac[es] a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey,* 505 U.S. at 877, 112 S.Ct. 2791.

▇ The Act is also unconstitutional because it does not include a health exception. In *Roe,* the Supreme Court held that the state, "in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Roe,* 410 U.S. at 164–65, 93 S.Ct. 705. The Court gave content to "health of the mother" in *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), released on the same day as *Roe,* wherein the Court listed factors which properly inform a physician's medical judgment about whether an abortion is "necessary":

We agree with the District Court that the medical judgment may be exercised in the light of all factors-physical, emotional, psychological, familial, and the woman's age-relevant to the well-being of the patient. All these factors may relate to health. This allows the attending physician the room he needs to make his best medical judgment. And it is

room that operates for the benefit, not the disadvantage, of the pregnant woman.

*Id.* at 192, 93 S.Ct. 705 (citation omitted). Reaffirming the health exception requirement, while recasting it in terms of what constitutes an undue burden, the *Casey* Court noted that "the essential holding of *Roe* forbids a State to interfere with a woman's choice to undergo an abortion procedure if continuing her pregnancy would constitute a threat to her health." *Casey,* 505 U.S. at 880, 112 S.Ct. 2791. Thus, states may not proscribe an abortion procedure, before or after viability, without providing an exception for when such procedure is necessary, in a physician's medical judgment, to preserve the physical or mental health of the woman.

A woman's health may be severely compromised by carrying a pregnancy to term. Certain physical and mental health conditions are aggravated by or progress during pregnancy. Physiological stress on the body increases during pregnancy and may exacerbate physical conditions such as certain neurological and immunological diseases, liver or kidney disease, severe hypertension, cardiac conditions, and diabetes. For example, for a woman who suffers from a severe cardiac condition, the coincidence of heart failure and labor means a fifty percent chance of dying. A woman who suffers from severe eye disease, relating to a preexisting condition of diabetes, may, because laser therapy is inconsistent with pregnancy, incur blindness if required to carry to term. Mental conditions, such as schizophrenia, may also worsen as a result of a pregnancy, putting the woman at greater risk for self-harm. In any of these cases, it may be in the woman's best health interest to consider an abortion.

The Act provides an exception to the ban only when a "partial-birth abortion . . . is necessary to save the life of the mother whose life is endangered by a physical disorder, illness or injury." N.J. STAT. ANN. § 2A:65A–6(b). Thus, under the Act,

a woman cannot have a "partialbirth abortion" when her health, rather than her life, is in danger. Read in conjunction with the Court's vagueness ruling, *see supra* pp. 494–95, the Act would preclude women with physical or mental health conditions, which are aggravated by or progress during pregnancy, from resorting to the safest abortion methods available. Left with hysterectomies, hysterotomies and abortions which ensure fetal demise in utero or require no steps while the fetus is partially delivered into the vagina, *see supra* pp. 498–99. "[a] woman would be forced to make an untenable choice between either undergoing a risky abortion procedure or continuing her pregnancy in the face of unknown risks and health concerns," *Hope Clinic v. Ryan,* 995 F.Supp. 847, 860 (N.D.Ill.1998); *see also Thornburgh v. American College of Obstetricians & Gynecologists,* 476 U.S. 747, 768–69, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986) (noting that the Court of Appeals held abortion regulation unconstitutional "because it required a 'trade-off' between the woman's health and fetal survival, and failed to require that maternal health be the physician's paramount consideration"), *overruled in part on other grounds, Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674; *Carhart v. Stenberg,* 972 F.Supp. 507, 524 (D.Neb. 1997) ("The Supreme Court and lower federal courts have consistently held that abortion regulations that impose medically unnecessary health risks on women are invalid."). Forcing a physician to wait until a pregnancy threatens a woman's life before resorting to a "partial-birth abortion" would not only be bad medicine, but is directly contrary to the dictates of *Roe* and *Casey*. Without a health exception, the Act places a substantial obstacle in the path of a woman seeking an abortion and is unconstitutional.

The Court also notes that the Act's life exception does not preserve a physician's discretion to determine whether a "partial-birth abortion" is necessary to preserve the life of the woman. In *Roe,* the Court

held that the state, in furtherance of its interest in potential life, may "regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Roe,* 410 U.S. at 164–65, 93 S.Ct. 705. The Act's life exception provides that a "partial-birth abortion" may be performed only if it "is necessary to save the life of the mother whose life is endangered by a physical disorder, illness or injury." N.J. STAT. ANN. § 2A:65A–6(b). This "necessary" language does not protect the physician's ability to make a judgment call as required by *Roe.* At best a "qualified life exception," *A Choice for Women v. Butterworth,* No. 98–774, slip op. at 19 (S.D.Fla. Nov. 23, 1998), its inadequacy independently imposes an undue burden on a woman's constitutional right to choose to have an abortion.

That the Act imposes an undue burden finds support in decisions of other federal district and circuit courts which have considered similar partial-birth abortion statutes. *See Planned Parenthood of Wis. v. Doyle,* 162 F.3d 463, 466–69 (7th Cir.1998) (directing district court to enter preliminary injunction); *Butterworth,* slip op. at 12–20 (permanent injunction); *Little Rock Family Servs., P.A. v. Jegley,* No. 97–581, slip op. at 43–61 (E.D.Ark. Nov. 13, 1998) (preliminary and permanent injunction); *Eubanks v. Stengel,* 28 F.Supp.2d 1024, 1034–35, 1041–42 (W.D.Ky.1998) (permanent injunction); *Planned Parenthood of Greater Iowa, Inc. v. Miller,* 1 F.Supp.2d 958, 962–64 (S.D.Iowa 1998) (preliminary injunction); *Brancazio v. Underwood,* No. 98–495, slip op. at 3–4 (S.D. W. Va. June 11, 1998) (temporary restraining order); *Hope Clinic v. Ryan,* 995 F.Supp. 847, 856–61 (N.D.Ill.1998) (preliminary and permanent injunction); *Summit Med. Assoc.,*

*P.C. v. James,* 984 F.Supp. 1404, 1454–55 (M.D.Ala.1998) (denying defendants' motion to dismiss on claim that lack of health exception imposed undue burden); *Planned Parenthood of So. Ariz., Inc. v. Woods,* 982 F.Supp. 1369, 1376–78 (D.Ariz. 1997) (preliminary and permanent injunction); *Carhart v. Stenberg,* 11 F.Supp.2d 1099, 1120–31 (D.Neb.1998) (permanent injunction); *Evans v. Kelley,* 977 F.Supp. 1283, 1315–19 (E.D.Mich.1997) (same); *Causeway Med. Suite v. Foster,* No. 97–2211, slip op. at 1 (E.D.La. July 21, 1997) (temporary injunction); *Rhode Island Med. Soc. v. Pine,* No. 97–416, slip op. at 1 (D.R.I. July 11, 1997) (temporary restraining order); *see also Women's Med. Prof. Corp. v. Voinovich,* 911 F.Supp. 1051, 1067–71 (S.D.Ohio 1995) (finding ban on "Dilation and Extraction" unconstitutional under *Danforth* and *Casey* ), *aff'd,* 130 F.3d 187, 200–02 (6th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1347, 140 L.Ed.2d 496 (1998); *cf. Intermountain Planned Parenthood v. Montana,* No. 97–477, slip op. at 11–13 (D. Mont. June 29, 1998) (permanently enjoining partialbirth abortion ban on basis that it violates the right to privacy as guaranteed by the Montana Constitution); *Planned Parenthood of Alaska, Inc. v. Alaska,* No. 97–6019, slip op. at 6–12 (Alaska Super.Ct. Mar. 13, 1998) (permanently enjoining partial-birth abortion ban as unconstitutional restraint on woman's right to privacy under Alaska State Constitution).[15]

The Act imposes an undue burden on a woman's constitutional right to terminate her pregnancy because its language potentially bans the most conventional and safest abortion procedures, without regard to the viability of the fetus and without pro-

---

**15.** The Court does not agree with the minority of courts which have held similar partial birth abortion statutes do not impose an undue burden. *See Richmond Med. Ctr. for Women v. Gilmore,* 11 F.Supp.2d 795, 827 (E.D.Va.) (finding plaintiffs established a likelihood of success that, without a maternal health exception, the partial-birth abortion ban imposed

"an undue burden on a woman's right to seek an abortion pre-viability"), *prelim. injunction stayed,* 144 F.3d 326, 328–332 (4th Cir.1998) (staying preliminary injunction issued by district court on basis that plaintiffs had no standing to seek injunctive relief); *Midtown Hosp. v. Miller,* 36 F.Supp.2d 1360 (N.D.Ga. 1997) (denying temporary restraining order).

viding a health or adequate life exception. The Act will be struck as unconstitutional.

## IV Conclusion

Plaintiffs have shown actual success on the merits of their claim that the Act is unconstitutional. The Court finds the Act unconstitutional on two bases. First, the Act is void for vagueness. Second, the Act places an undue burden on a woman's constitutional right to obtain an abortion. For these reasons, the Act threatens women with irreparable injury because they may be denied access to the most conventional and safest abortion procedures. The Act also threatens irreparable injury to plaintiff physicians and Planned Parenthood because they may face license revocation and heavy fines for performing constitutionally-permissible abortions.

Threatened injury to plaintiffs and their patients far outweighs the potential harm to defendants. The Act does not protect the Legislature's legitimate interest in the health of the mother, see Casey, 505 U.S. at 878, 112 S.Ct. 2791, but rather, poses a threat to the health of the woman by potentially banning the safest abortion methods and by failing to include a health or adequate life exception. The Act also fails to protect the Legislature's legitimate interest in potential human life. See Casey, 505 U.S. at 878–79, 112 S.Ct. 2791. The Act does not hamper abortion practice unless it is construed to include the most conventional abortion methods. See Planned Parenthood of Wis. v. Doyle, 162 F.3d 463, 467 (7th Cir.1998). Even then, the Act does not influence the woman's choice in favor of a live birth, but rather, places the woman in the position of finding another way to obtain an abortion without compromising her health. The Legisla-

ture warns that, in invalidating the "partial-birth abortion" ban, the Court starts down the "slippery slope to infanticide." In dismissing this warning, the Court takes its cue from the Legislature itself which, in passing the Act, thought civil penalties sufficient punishment for what it now claims to be infanticide.[16]

There is no question that the public interest is best served by issuing a permanent injunction in this case. The public has an important interest in the implementation of duly passed statutes. However, this interest is lowered when the statute in question threatens to chill constitutional rights. The Court has concluded that the Act threatens the woman's constitutional right to terminate her pregnancy. It is in the public interest to prevent the Act from taking effect and to thereby protect the woman's right to choose.

The Court will enter an Order consistent with this Opinion.

### ORDER

This matter is before the Court on the request of plaintiffs Planned Parenthood of Central New Jersey and Drs. Holmes, Wallace and Weiss for a declaration that the New Jersey Partial–Birth Abortion Ban Act of 1997, ch. 262, 1997 N.J. Sess. Law Serv. 871–72 (West), *codified at* N.J. STAT. ANN. §§ 2A:65A–5 to –7, is unconstitutional and for a preliminary and permanent injunction. For reasons set forth in the Opinion of this Court, attached herewith,

IT IS on this 8th day of December 1998,

ORDERED that plaintiffs' request for declaratory relief is granted and the New Jersey Partial–Birth Abortion Ban Act of 1997, ch. 262, 1997 N.J. Sess. Law Serv.

---

16. *See* Ann MacLean Massie, *So–Called "Partial–Birth Abortion" Bans: Bad Medicine? Maybe. Bad Law? Definitely!*, 59 U. PITT. L.REV. 301, 324 n. 103 (1998) (" 'If people seriously thought it was infanticide, they wouldn't be talking about punishing it for 2 years. The reason why Congress is interested in punishing this-why some Members of Con-

gress are interested in punishing it is not because it is infanticide. It is precisely because it is abortion.' " (quoting "The Partial–Birth Abortion" Ban Act of 1995: Hearing Before the Senate Comm. on the Judiciary, 104th Cong. 200 (1995) (statement of Louis Michael Seidman, Prof. of Law, Georgetown Univ. Law Ctr., Washington, D.C.))).

871–72 (West), *codified at* N.J. STAT. ANN. §§ 2A:65A–5 to –7, is declared unconstitutional; and it is further

ORDERED that plaintiffs' request for a preliminary and permanent injunction is granted; and it is further

ORDERED that defendants are permanently enjoined from enforcing any provision of the New Jersey Partial–Birth Abortion Ban Act of 1997, ch. 262, 1997 Sess. Law Serv. 271–72 (West), *codified at* N.J. STAT. ANN. §§ 2A:65A–5 to –7; and it is further

ORDERED that this case is closed.